## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**CHRISTOPHER V.,**[1]

          **Plaintiff,**                  **Case No. 1:21-cv-4207**

                                             **Magistrate Judge Norah McCann King**

  **v.**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

          **Defendant.**

## OPINION AND ORDER[2]

      This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Christopher V. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying those applications.[3] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Because the Court can resolve this matter on the briefs, Plaintiff's request for oral argument, *Plaintiff's Brief*, ECF No. 8, p. 29, is denied.

[3] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

## I.      PROCEDURAL HISTORY

On January 4, 2013, Plaintiff filed his applications for benefits, alleging that he has been disabled since October 21, 2011. R. 135−36, 163−64, 240−48.[4] The applications were denied initially and upon reconsideration. R. 169−74, 179−81. Plaintiff sought a *de novo* hearing before an administrative law judge. R. 185−89. Administrative Law Judge Kenneth Bossong ("ALJ Bossong") held a hearing on January 20, 2016, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. 55−114. In a decision dated June 15, 2016, ALJ Bossong concluded that Plaintiff was not disabled within the meaning of the Social Security Act from October 21, 2011, Plaintiff's alleged disability onset date, through the date of that decision ("the 2016 decision"). R. 20−50. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on May 26, 2017. R. 1−6. Plaintiff timely filed an appeal from that decision pursuant to 42 U.S.C. § 405(g). R. 695−99. On September 28, 2018, United States District Judge Katharine S. Hayden reversed that decision and remanded the action for further proceedings. R. 735; *see also* R. 729−33 (remanding action for further consideration of Plaintiff's "social malfunction" and its impact on Plaintiff's job prospects or job availability).

On May 23, 2019, the Appeals Council vacated the 2016 decision and remanded the matter to the ALJ for further proceedings consistent with Judge Hayden's decision. R. 740. The Appeals Council also noted that Plaintiff "filed a subsequent claim for disability benefits on June 21, 2017. The State agency found the claimant disabled as of June 16, 2016. The Appeals Council reviewed the determination and finds it is supported by substantial evidence. Therefore,

---

[4] As discussed below, Plaintiff filed a subsequent claim for disability benefits on June 21, 2017. R. 740. A copy of this application does not appear in the record.

the Appeals Council affirms the determination; however, the period prior to June 16, 2016 requires further adjudication." *Id.* The Appeals Council therefore directed that, "[i]n compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision for the period prior to June 16, 2016." R. 740.

On February 6, 2020, Administrative Law Judge, Karen Shelton ("ALJ Shelton") held an administrative hearing, at which Plaintiff, who was again represented by counsel, again testified, as did a vocational expert. R. 676−94. In a decision dated March 24, 2020, ALJ Shelton concluded that Plaintiff was not disabled prior to February 17, 2016, the date on which Plaintiff was last insured for disability insurance benefits, but that she became disabled on that date and remained disabled through the date of that decision ("the 2020 decision"). R. 745−71. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined to assume jurisdiction, R. 668−72, explaining, *inter alia*, as follows:

> In this case, the Administrative Law Judge [ALJ Shelton] found that, before the EOD [established onset date of February 17, 2016], the claimant had a residual functional capacity for a limited range of sedentary work, including, but not limited to, occasional contact with coworkers, supervisors, and the public (Finding 4). However, beginning on the EOD, the residual functional capacity is for the same limited range of sedentary work, except the claimant now is unable to have contact with supervisors or coworkers on even an occasional basis (Finding 5). The Administrative Law Judge stated that, before the EOD, the evidence of record showed severe anxiety/panic disorder and major depression disorder, including reports of the claimant being anti-social, having a history of altercations, and the record showing multiple emergency room presentations. However, exam findings were mostly normal, except for mild pain distress; a depressed, anxious, or agitated mood/affect; and occasional rapid speech or talkative-ness. Treatment was conservative with medication. The emergency room presentations were numerous but sporadic, occurring on average 1-2 a year. Further, external stressors, such as substance abuse or situational stressors involving family and friends, were the cause. Finally, none resulted in extended stays. In addition, the claimant was able to attending [sic] medical appointments without issue, and have some, albeit limited, involvement with family and friends (Decision, pages 9, 13-15). For the period beginning on the EOD, the Administrative Law Judge notes that, in addition

3

to exam findings of continued abnormal mood/affect, first-time clinical findings include poor impulse control, and impaired memory and concentration. Further, the claimant reported agoraphobia and a total lack of involvement with others. *Finally, on the EOD, Lawrence Mintzer, Ph.D., the psychological consultative examiner, opined that the claimant has, among other limitations, marked limitations in terms of interacting appropriately with others and responding appropriately to usual work situations* (Decision, pages 17-20). *This opinion was first issued on the EOD, and there is no evidence that it relates back.* Dr. Mintzer based the opinion on the exam findings and claimant statements for that day (Exhibit 15F). The Administrative Law Judge noted the opinion findings, then explained why they were or were not supported and consistent with the record for the periods at issue. For the social interaction issue, the Administrative Law Judge assigned no weight to the opinion for the period at issue prior to the EOD, and gave weight to the opinion as of the EOD (Decision, pages 19-20). Therefore, the Appeals Council finds that the Administrative Law Judge sufficiently explained his [sic] findings on the claimant's periods of disability and non-disability, and the findings are supported by the substantial evidence.

Accordingly, we do not find that [Plaintiff's] written exceptions provide a basis for changing the Administrative Law Judge's decision dated March 24, 2020. In addition, we find that the Administrative Law Judge's decision complies with the orders of the U.S. District Court and Appeals Council. Furthermore, the decision is consistent with our applicable laws, regulations, and Social Security Rulings.

R. 668–69 (emphasis added).

On March 5, 2021, Plaintiff filed this appeal pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). ECF No. 1. On April 25, 2022, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 19.[5] On April 29, 2022, the case was reassigned to the undersigned. ECF No. 20. The matter is ripe for disposition.

## II.   LEGAL STANDARD

### A.   Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

---

[5]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

5

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016).  The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4.  An ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121

6

("Although the ALJ may weigh the credibility of the evidence, [s]he must give some indication of the evidence which [s]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, a court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is

disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

### B.     Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.   ALJ SHELTON'S 2020 DECISION AND APPELLATE ISSUES[6]

Prior to the established onset date of February 17, 2016, Plaintiff was a younger individual. R. 768. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018. R. 750. At step one, ALJ Shelton found that Plaintiff had not engaged in substantial gainful activity between October 21, 2011, his alleged disability onset date, through the date of the 2020 decision. *Id*.

At step two, ALJ Shelton found that Plaintiff suffered from the following severe impairments since the alleged onset of disability, October 21, 2011: degenerative disc disease, obesity, anxiety/panic disorder, and major depressive disorder. *Id*.  ALJ Shelton also found that the following diagnosed impairments were not severe: lower extremity edema, status post-left

---

[6] ALJ Shelton acknowledged that, consistent with the May 2019 order of the Appeals Council, it is the period prior to June 16, 2016, that required further adjudication. R. 747 (citing R. 740).

9

orbital wall fracture, asthma, diverticulosis, folliculitis, dermatitis, right finger contusion, alcohol use disorder, and cannabis use disorder. R. 751–53.

At step three, ALJ Shelton found that, since October 21, 2011, Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 753–56.

At step four, ALJ Shelton found that, prior to February 17, 2016, *i.e.*, the date on which Plaintiff became disabled, Plaintiff had the RFC to perform a limited range of sedentary work and could have "occasional contact with supervisors, coworkers, and the public" ("RFC prior to February 17, 2016"). R. 756–61. ALJ Shelton went on to find that, beginning on February 17, 2016, Plaintiff had the RFC to perform a limited range of sedentary work, including "occasional contact with the public[,]" but was "[u]nable to have contact with supervisors or coworkers on even an occasional basis, meaning could have contact on less than an occasional basis with supervisors and coworkers" ("RFC beginning on February 17, 2016"). R. 762–68. ALJ Shelton also found that neither RFC permitted the performance of Plaintiff's past relevant work as a data entry clerk or conveyer belt package sorter. R. 768.

At step five and relying on the testimony of the vocational expert, ALJ Shelton found that, prior to the established onset date of February 17, 2016, a significant number of jobs—*i.e.*, approximately 75,000 jobs as a sorter; approximately 110,000 jobs as an assembler; approximately 80,000 jobs as an inspector—existed in the national economy and could be performed by Plaintiff. R. 769–70. However, ALJ Shelton also found that, beginning on February 17, 2016, there were no jobs that existed in significant numbers that Plaintiff could perform. R. 770. Accordingly, ALJ Shelton concluded that Plaintiff was not disabled within the meaning of the Social Security Act prior to February 17, 2016, but became disabled on that date.

10

R. 770−71. ALJ Shelton also found that Plaintiff's substance use disorder is not a contributing factor material to the determination of disability. R. 770.

Plaintiff disagrees with ALJ Shelton's findings at steps three, four, and five, and the Court presumes that Plaintiff asks that the decision of the Acting Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Brief,* ECF No. 8; *Plaintiff's Reply Brief*, ECF No. 18. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 17.

## IV.   SUMMARY OF RELEVANT MEDICAL EVIDENCE

On February 17, 2016, Lawrence Mintzer, Ph.D., a licensed psychologist, conducted a consultative examination of Plaintiff at the request of the state agency. R. 644−47. Dr. Mintzer noted Plaintiff's activities of daily living as follows:

> [Plaintiff] does very little of the cleaning at his home because "Things are just hard to do." [Plaintiff] cooks one meal each day. [Plaintiff] and his father do the grocery shopping together "because I can't push the cart because of the vibrations, that freak me out, and there are other people there." [Plaintiff] usually does not get along too well with other people "because of my social skills. I lost all my friends because of my anxiety." [Plaintiff] is not involved in any group activities. He doesn't see any family members. [Plaintiff's] father handles [Plaintiff's] finances. [Plaintiff] does not keep up with his grooming and hygiene. He said that sometimes he will go for three or four weeks without a shower because "I can't feel that I'm touching myself." On a typical day [Plaintiff] lies around. He reads things on the Internet.

R. 645−46. Upon mental status examination, Dr. Mintzer noted as follows:

> [Plaintiff] was oriented to person, place, and time, with the exception that he believed that I was meeting with him on a Thursday, when in fact I met with him on a Wednesday. [Plaintiff] was casually dressed and adequately groomed, with a bushy beard. He is of average height and is overweight. His motor activity was appropriate and relaxed. His speech was within normal limits. [Plaintiff] seemed a

11

bit depressed about his situation. His affect was mildly constricted. [Plaintiff] has never experienced either auditory or visual hallucinations. [Plaintiff's] thought processes were goal-directed and his speech was coherent. There were no indications of any delusional thinking. [Plaintiff] has occasional suicidal thoughts "when I'm having a full-blown panic attack." [Plaintiff] made one suicide attempt, with pills, in approximately 2003. There were no indications of any homicidal thinking. [Plaintiff] does not experience any ideas of reference. [Plaintiff] has agoraphobia and social phobia.

[Plaintiff's] abstract thinking is fairly good. His fund of general knowledge is fairly good. His capacity to perform simple calculations is good. [Plaintiff's] concentration was good; for instance, he performed serial sevens fairly quickly, making no errors while doing them. He was able to correctly spell the word "world" both forwards and backwards. [Plaintiff's] intelligence is estimated to be in the average range. [Plaintiff's] remote memory is good. His recent memory is fairly good; for instance, he was able to recall two out of three items after one minute and again after five minutes. He was able to recall what he had eaten for dinner on the evening prior to my meeting with him. [Plaintiff's] immediate retention and recall are fairly good; for instance, he was able to repeat seven digits forward and four digits in reverse. [Plaintiff's] impulse control is somewhat poor; for instance, sometimes when he gets angry he throws or breaks things. [Plaintiff's] social judgment is fair. His insight is good. He seems to be a reliable informant.

R. 646−47. Dr. Mintzer diagnosed panic disorder, agoraphobia, social anxiety disorder, alcohol use disorder, and cannabis use disorder (in sustained remission). R. 647. According to Dr. Mintzer, Plaintiff "has an illness that is expected to last for the next 12 months. [Plaintiff's] limitations are caused by a combination of physical health problems, psychological problems, and some alcohol abuse. Overall, [Plaintiff's] limitations are moderate to severe in degree." R. 647. According to Dr. Mintzer, Plaintiff's "prognosis appears to be very guarded." *Id.*

On the same day, Dr. Mintzer also completed a three-page, check-the-box and fill-in-the-blank form entitled, "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." R. 648−51 (which includes a separate electronic signature page). Dr. Mintzer used the following scale to assess Plaintiff's limitations:

- None -      Absent or minimal limitations. If limitations are present they are transient and/or expected reactions to psychological stresses.
- Mild -      There is a slight limitation in this area, but the individual can

generally function well.
- Moderate -   There is more than a slight limitation in this area but the individual is still able to function satisfactorily.
- Marked -   There is serious limitation in this area. There is a substantial loss in the ability to effectively function.
- Extreme -   There is major limitation in this area. There is no useful ability to function in this area.

R. 648. In assessing the extent, if any, to which Plaintiff's ability to understand, remember, and carry out instructions was affected by his impairment, Dr. Mintzer found that Plaintiff had no limitation in his ability to understand and remember simple instructions and in his ability to make judgments on simple work-related decisions; a moderate limitation in his ability to understand and remember complex instructions and in the ability to make judgments on complex work-related decisions; and a marked limitation in his ability to carry out simple and complex instructions. *Id*. In support of these findings, Dr. Mintzer explained as follows:

> [Plaintiff] was able to recall two out of three items after one minute and again after five minutes. He was able to repeat seven digits forward and four digits in reverse. His concentration was good; for instance, he performed serial sevens fairly quickly, making no errors while doing them. He was able to correctly spell the word "world" both forwards and backwards. Intelligence is estimated to be in the average range. [Plaintiff] has very significant problems with panic attacks, agoraphobia, and social anxiety. He very rarely leaves the house by himself because of his agoraphobia and social phobia.

*Id*. In assessing the extent, if any, to which Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting, was affected by his impairment, Dr. Mintzer found that Plaintiff had a marked limitation in his ability to interact appropriately with the public, supervisors, and co-workers, and in his ability to respond appropriately to usual work situations and to changes in a routine work setting. R. 649. In support of these conclusions, Dr. Mintzer explained as follows:

> [Plaintiff] has problems with back pain. He has very significant problems with panic attacks, agoraphobia, and social phobia. He rarely leaves the house by himself because of his agoraphobia and social phobia. At times he will go for three or four

13

> weeks without taking a shower because of his anxiety. When he was working he
> got along well with his bosses. He said that his coworkers respected him even
> though he was a "loud-mouth."

*Id*. Dr. Mintzer did not believe that Plaintiff's impairment affected any other ability. *Id*.

As to any impairments that include alcohol and/or substance abuse, Dr. Mintzer explained as follows: Plaintiff "consumes alcohol about twice per week, drinking between six and eight beers each time that he drinks. It is my opinion that his consumption of alcohol does not contribute to his panic attacks, agoraphobia, and social phobia. I believe that his limitations would remain the same even if he was abstaining from alcohol." *Id*. Finally, Dr. Mintzer denied that Plaintiff could manage benefits in his own best interest. R. 650.

Significantly, the form used by Dr. Mintzer advised that "[t]he limitations above [are] presumed to be your opinion *regarding current limitations only*." *Id*. (emphasis added). Dr. Mintzer left blank the following question: "However, if you have sufficient information to form an opinion within a reasonable degree of medical or psychological probability as to past limitations, on what date were the limitations you found above first present?" *Id*.

## V.    DISCUSSION

Plaintiff raises a number of challenges to ALJ Shelton's 2020 decision, which the Court addresses in turn.

### A.    Step Three

Plaintiff first challenges ALJ Shelton's finding at step three of the sequential evaluation , *i.e*., that Plaintiff's mental and physical impairments neither meet nor medically equal a listed impairment, specifically, Listings 12.04, 12.06, and 1.04. *Plaintiff's Brief*, ECF No. 8, pp. 16–20; *Plaintiff's Reply Brief*, ECF No. 18, pp. 8–10. Plaintiff's challenge is not well taken.

At step three, an ALJ considers whether the combination of the claimant's medically determinable impairments meets or equals the severity of one of the impairments in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). An impairment meets a listed impairment if it satisfies "'*all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Jones,* 364 F.3d at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (emphasis in original). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the *overall* functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis added). "[T]he medical criteria defining the listed impairments [are set] at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id.* at 532 (emphasis in original) (quoting 20 C.F.R. § 416.925(a)). Although an ALJ is not required to use "particular language" when determining whether a claimant meets a listing, the ALJ's discussion must provide for "meaningful review." *Jones*, 364 F.3d at 505 (citing *Burnett*, 220 F.3d at 120). Accordingly, if the ALJ's decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing," "[t]his discussion satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review of the step three determination." *Id*.

As previously noted, Plaintiff challenges ALJ Shelton's consideration of Listings 12.04, 12.06, and 1.04, which the Court will address in turn.

1.      **Listings 12.04 and 12.06**

Listing 12.04 addresses depressive, bipolar, and related disorders, and Listing 12.06

addresses anxiety and obsessive-compulsive disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§

12.04 and 12.06. In order to meet either of these Listings, a claimant must meet the Listings'

paragraph A criteria and either the paragraph B or paragraph C criteria. 20 C.F.R. Pt. 404, Subpt.

P, App. 1, §§ 12.04, 12.06. [7] The paragraph B criteria are met when a claimant has an extreme

limitation of one, or a marked limitation of two,[8] of the following four mental functional areas:

---

[7] ALJ Shelton did not expressly discuss the paragraph A criteria. R. 754−56. To the extent that
Plaintiff's arguments may be construed as challenging ALJ's Shelton's omission in this regard,
*Plaintiff's Brief*, ECF No. 8, p. 16, remand is not required on this basis. Once ALJ Shelton
determined that Plaintiff's mental impairments did not satisfy the paragraphs B or C criteria,
there was no reason to expressly consider the paragraph A criteria. *See* 20 C.F.R. Pt. 404, Subpt.
P, App. 1, §§ 12.04A (requiring medical documentation of a depressive disorder or bipolar
disorder), 12.06A (same); *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016)
(stating that "the omission of the 'paragraph A' analysis does not render the ALJ's decision
unreviewable" where "[i]t is quite plain that the ALJ's decision rested on the absence of both
'paragraph B' and 'paragraph C' criteria[.]"); *Lewis v. Comm'r of Soc. Sec.*, No. 15CV06275,
2017 WL 6329703, at *8 (D.N.J. Dec. 11, 2017) ("In reviewing a case, 20 C.F.R. Part.404,
Subpart P indicates that a claimant must prove both Paragraph A and B criteria. The ALJ simply
chose to proceed with a full analysis of Paragraph B, and, upon determining that Paragraph B
was not satisfied, chose not to address Paragraph A as there would be no point given that the
criteria for Paragraph B had already failed.").
        In addition, Plaintiff does not challenge the ALJ's finding that he did not meet the
paragraph C criteria of Listings 12.04 and 12.06. *See generally Plaintiff's Brief*, ECF No. 8;
*Plaintiff's Reply Brief*, ECF No. 18; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04C
(providing that the paragraph C criteria are met if the claimant's mental disorder is "serious and
persistent[,]" *i.e.*, the claimant has a medically documented history of the existence of the
disorder over a period of at least two years and there is evidence of both of the following: (1)
medical treatment, mental health therapy, psychosocial support(s), or a highly structured
setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental
disorder; and (2) marginal adjustment, *i.e.*, the claimant has minimal capacity to adapt to changes
in the claimant's environment or to demands that are not already part of his or her daily life),
12.06C (same); *id.* at § 12.00G2.
[8] A "marked" limitation means that the claimant is seriously limited his ability to function
independently, appropriately, and effectively and on a sustained basis in a specified area. §
12.00A2b, 12.00F2d. An "extreme" limitation means that the claimant is unable to function
independently, appropriately, and effectively on a sustained basis in a specified area. *Id.*; *see also
id.* at §12.00F2e.

16

understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id*. at §§ 12.04B, 12.06B.

In the present case, the heading of ALJ Shelton's step three discussion states that "[*s*]*ince October 21, 2011*, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" R. 753 (citations omitted) (emphasis added). When determining whether Plaintiff's mental impairments met or medically equaled Listings 12.04 or 12.06, ALJ Shelton specifically explained why she found that Plaintiff had only moderate limitations in the four broad areas of functioning under the paragraph B criteria and why Plaintiff did not meet the criteria of paragraph C, reasoning as follows:

> *Before the established onset date*, the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of a listing in Category 12.00, including, but not limited to, listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.
>
> In the areas of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace, the claimant has moderate limitations *before the established onset date*. The area of understanding, remembering, or applying information refers to the abilities to learn, recall, and use information to perform work activities. The area of concentrating, persisting, or maintaining pace refers to the abilities to focus attention on work activities and stay on task at a sustained rate.
>
> In this matter, the claimant reported, *prior to February 17, 2016* having an eighth grade education, rarely driving, and having difficulty with managing money. However, he also reported, *prior to February 17, 2016*, performing personal care activities, driving at least sometimes, watching television (sports), and using a computer (reads the news). (Hearing Testimony). Significantly, the above activities

17

demonstrate the ability to comprehend, learn, follow rules, understand, retain information for future use, focus, pay attention, and/or complete tasks.

Turning to the medical evidence, as detailed in the Finding Five discussion, the record reveals generally normal, with only minimal, findings *prior to February 17, 2016*. For example, the record *prior to February 17, 2016* documents exam findings of "mild" pain distress (Exhibit 4F/18, 26) and an abnormal mood or affect, described as depressed, crying, upset, anxious, agitated, or flat. (Exhibits 2F/1, 4, 8; 3F/24, 32; 4F/58, 127; 5F/2, 3, 6; 10F/2, 4, 7, 9, 10; 11F/5, 7, 8, 9; 13F/6, 10, 18; 14F/1). These records also document an exam finding of anxious behavior ("constantly" walking around the room) (Exhibit 4F/127).

However, exams in these records otherwise revealed that the claimant was alert, fully oriented, not in any acute distress, and/or responding appropriately to questions, and/or had a normal affect, a normal attention span, normal concentration, normal insight, and/or no noted abnormal mental status findings in terms of thought processes, memory, attention, or concentration. (Exhibits 1F/3, 5, 6; 2F/1, 2, 7, 8; 3F/5, 6, 15, 24; 4F/8, 18, 19, 26, 37, 49, 58, 77, 92, 119, 127, 136, 137; 5F/1-6; 6F/1-7; 7F; 8F/1, 2, 5, 6, 8, 9, 12, 14, 15, 17, 18, 21, 24; 10F/1, 2, 4, 7; 11F/5-9; 12F/2, 3, 6, 7; 13F/2, 6, 10, 13, 17, 18, 21, 22).

Accordingly, in light of the above, the claimant has moderate limitations in the areas of understanding, remembering, or applying information and concentrating, persisting concentrating, persisting, or maintaining pace *before the established onset date*.

In interacting with others, the claimant has a moderate limitation *before the established onset date*. This area refers to the abilities to relate to and work with supervisors, co-workers, and the public. In this matter, the claimant reported, *prior to February 17, 2016* being "anti-social" and having a history of altercations. However, the record also documents, *prior to February 17, 2016*, the claimant living with family, doing activities with/spending time with friends, and attending medical/mental health appointments without reported difficulty (Exhibits 1F-14F; Hearing Testimony).

Turning to the medical evidence, as noted above and detailed in the Finding Five discussion, the record reveals generally normal, with only minimal, findings prior to February 17, 2016. For example, the record *prior to February 17, 2016* documents exam findings of "mild" pain distress (Exhibit 4F/18, 26) and an abnormal mood or affect, described as depressed, crying, upset, anxious, agitated, or flat. (Exhibits 2F/1, 4, 8; 3F/24, 32; 4F/58, 127; 5F/2, 3, 6; 10F/2, 4, 7, 9, 10; 11F/5, 7, 8, 9; 13F/6, 10, 18; 14F/1). These records also document exam findings of rapid speech or talkative-ness (Exhibits 4F/58; 13F/10, 13) and anxious behavior ("constantly" walking around the room) (Exhibit 4F/127). However, exams in these records otherwise revealed that the claimant was alert, fully oriented, pleasant, not in any acute distress, and/or responding appropriately to questions, and/or had a

18

normal affect, normal speech, normal eye contact, and/or no noted abnormal mental status findings in terms of cooperation or relation to the examiner. (Exhibits 1F/3, 5, 6; 2F/1, 2, 7, 8; 3F/5, 6, 15, 24; 4F/8, 18, 19, 26, 37, 49, 58, 77, 92, 119, 127, 136, 137; 5F/1-6; 6F/1-7; 7F; 8F/1, 2, 5, 6, 8, 9, 12, 14, 15, 17, 18, 21, 24; 10F/1, 2, 4, 7; 11F/5-9; 12F/2, 3, 6, 7; 13F/2, 6, 10, 13, 17, 18, 21, 22).

Accordingly, in light of the above, the claimant had a moderate limitation in the area of interacting with others *before the established onset date*.

Finally, as for adapting or managing oneself, the claimant has experienced a moderate limitation *before the established onset date*. This area refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. In this matter, despite symptoms, the claimant performs personal care activities and attended medical/mental health appointments, *prior to the established onset date*, without reported difficulty in planning these activities, avoiding normal hazards while pursing these activities (like avoiding cars while crossing a street) or dealing with changes (like a changed appointment time). (Hearing Testimony). Accordingly, in light of the above, the claimant had a moderate limitation in the area of adapting or managing oneself *before the established onset date*.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life. For example, the record shows no episodes of deterioration that have required the claimant to be, for example, hospitalized due to mental health for an extended time in the relevant period (Exhibits 1F-18F). Further, the record fails to show that the claimant is unable to function outside of his home or a more restrictive setting, without substantial psychosocial supports. For example, the claimant attended and participating at the hearings in this matter before and after the remand. Accordingly, the "paragraph C" criteria are not satisfied.

Finally, the undersigned notes that no State agency psychological consultant concluded that a mental listing is medically equaled.

R. 754−56 (emphasis added). Substantial evidence supports ALJ Shelton's reasoning in this

regard. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06; *cf. Orr v. Comm'r Soc. Sec.*,

805 F. App'x 85, 89 (3d Cir. 2020) ("Substantial evidence supports that finding [moderate

difficulties in maintaining concentration, persistence or pace] because [the claimant] spent time

online searching for auto parts; he read magazines; he watched a lot of politics and history on television; and he got six to seven hours of sleep a night, despite being awakened by discomfort in his leg."); *Parks v. Comm'r of Soc. Sec.*, 401 F. App'x 651, 655 (3d Cir. 2010) (agreeing with the ALJ who found that the ability to read, watch television, and play video games "required a degree of concentration, persistence, or pace" and holding "that when all of the testimony is considered together, substantial evidence supports the ALJ's finding of moderate limitations in concentration, persistence, or pace").

Plaintiff, however, complains that ALJ Shelton did not "find that based on Dr. Mintzer's report that the requirements of the Listings of Impairments were met" and that she "makes no distinction as to the period both before and after the report of Dr. Mintzer[.]" *Plaintiff's Brief*, ECF No. 8, p. 18. Plaintiff further argues that, even accepting that the limitations contained in Dr. Mintzer's report applied only as of February 17, 2016, *i.e.*, the date of that report, "at least as of that date the findings of Dr. Mintzer would show impairments that met the requirements of the Listings of Impairments." *Id*. at 18−19. Plaintiff goes on to argue that ALJ Shelton's finding of "moderate" limitations "is either contrary to the actual evidence reported or not based on any evidence at all." *Id*. at 19; *see also id*. at 20 (insisting that ALJ Shelton's conclusions regarding the paragraph B criteria "are unaccompanied by any coherent rationale. They are inconsistent with any reasonable view of the entire record. In fact, as discussed at length above, they are actually contrary to that evidence, certainly at least as of the examination of Dr. Mintzer. They are not supported by substantial evidence").

The Acting Commissioner responds that substantial evidence supports ALJ Shelton's consideration of the paragraph B criteria, detailing these findings with citations to record evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 17, pp. 13−15. The

20

Acting Commissioner emphasizes that ALJ Shelton expressly found that Plaintiff's mental impairments did not meet listing criteria at any time "'since October 21, 2011[,]'" similarly finding at step four that Plaintiff had no more than moderate limitations in the four broad areas of mental functioning. *Id.* at 15 (citing R. 754, 762). The Acting Commissioner further argues that, in any event, even if ALJ Shelton erred in her consideration, "Plaintiff has not shown how further analysis by the ALJ could have changed the outcome of her claim." *Id.* at 17 (citing *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016)).

In reply, Plaintiff rejects that ALJ Shelton's alleged failures at step three are harmless error. He notes that the plaintiff in *Holloman* "'merely asserts that harm was done because a positive finding at step three would have eliminated the need to proceed through steps four and five[,]'" but, in the instant case, ALJ Shelton "fails to articulate a rationale that explains how she reached her conclusion." *Plaintiff's Reply Brief*, ECF No. 18, p. 8 (quoting *Holloman*, 639 F. App'x at 814). According to Plaintiff, "[t]o the extent that *Hollomon* would say that this failure of articulation is a harmless error, it is our position that the Court is wrong and not following its own precedents. Moreover, as again set out in detail in Plaintiff's Brief, we do contend the Listings of Impairments are met." *Id.*; *see also id.* at 9–10 (relying on Paragraph B arguments advanced in *Plaintiff's Brief*).

Plaintiff's arguments are not well taken. As a preliminary matter, to the extent that ALJ Shelton did not expressly discuss whether Plaintiff's impairments met or medically equaled a listed impairment as of the established onset date of February 17, 2016–which is also the date of Dr. Mintzer's report–and after that date, any error in this failure is, at most, harmless. As set forth above and discussed in more detail below, ALJ Shelton found that, beginning February 17, 2016, there were no jobs that exist in significant numbers in the national economy that Plaintiff

could perform and, therefore, Plaintiff became disabled as of that date. R. 762−71. Accordingly,

any failure to find at step three that Plaintiff was disabled beginning on February 17, 2016, is

harmless. *See See Shinseki v. Sanders*, 556 U.S. 396, 409−10 (2009) ("[T]he burden of showing

that an error is harmful normally falls upon the party attacking the agency's determination. . . .

[T]he party seeking reversal normally must explain why the erroneous ruling caused harm.");

*Rutherford*, 399 F.3d at 553 (finding that "a remand is not required here because it would not

affect the outcome of the case").

   To the extent that Plaintiff contends that ALJ Shelton erred in her consideration of the

paragraph B factors prior to the established onset date of February 17, 2016, this Court disagrees.

Plaintiff does not explain why−nor does he even assert that−he had an extreme limitation in one

of the four areas of mental functioning or two marked limitations in any of those four areas. *See*

*Plaintiff's Brief*, ECF No. 8, pp. 16−20. Instead, as noted above, Plaintiff simply complains that

ALJ Shelton's discussion did not distinguish between the periods before and after February 17,

2016−the date of Dr. Mintzer's report and the established onset date−and that she did not find

that he met the paragraph B criteria as of that date. *See id.*; *see also Plaintiff's Reply Brief*, ECF

No. 18, pp. 8−10 (insisting that he "spent a great deal of time" explaining in his opening brief

that ALJ Shelton erred in finding Plaintiff had only "moderate" limitations in each of the four

broad areas of mental functioning and therefore relies on arguments in that brief). To the extent

that Plaintiff suggests that the limitations found in Dr. Mintzer's report apply to the period prior

to February 17, 2016, the date of that report, ALJ Shelton properly found, for the reasons

discussed in more detail later in this Opinion and Order, that Dr. Mintzer expressly declined to

reach back in time to the alleged onset date of October 21, 2011. R. 765−66. In any event, even

if Dr. Mintzer's limitations did apply prior to February 17, 2016, Plaintiff has not explained how

those limitations satisfy the paragraph B criteria of the listed impairments, *i.e.*, one extreme limitation or two marked limitations in the four broad areas of mental functioning. *See generally Plaintiff's Brief*, ECF No. 8, pp. 16–20; *Plaintiff's Reply Brief*, ECF No. 18, pp. 8–10; *see also Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the Court does not understand what argument Plaintiff has made here. Plaintiff has done no more than thrown down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court does not assemble arguments for a party from fragments."). *See also Holloman*, 639 F. App'x at 814–15 (finding no basis to remand case where the claimant failed to explain how he "might have prevailed at step three if the ALJ's analysis had been more thorough").

For all these reasons, the Court concludes that substantial evidence supports ALJ Shelton's finding that Plaintiff does not meet the paragraph B criteria of Listings 12.04 and 12.06 prior to his established onset date of February 17, 2016, and that any error in failing to expressly discuss whether Plaintiff's impairments met or medically equaled a listed impairment as of that date and thereafter is, at most, harmless.

### 2. Listing 1.04

ALJ Shelton also considered Listing 1.04, which addresses disorders of the spine. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. In order to meet this Listing, Plaintiff must demonstrate the following:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex

loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[9]

*Id*.

---

[9] Section 1.00B2b defines an inability to ambulate as follows:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*. at § 1.00B2b.

24

In this case, ALJ Shelton determined at step three of the sequential evaluation that Plaintiff's degenerative disc disease did not meet or medically equal Listing 1.04, reasoning as follows:

> As to degenerative disc disease, this impairment, considered singly and in combination, does not meet or equal listing 1.04. Listing 1.04 requires "A. evidence of nerve root compression" or "B. spinal arachnoiditis" or "C. lumbar spinal stenosis", resulting in the inability to ambulate effectively. "Inability to ambulate effectively means an extreme limitation of the ability to walk" (1.00B2b). 1.04A requires neurological deficits that are not present in this matter, as detailed in the Finding Five and Six discussions (Exhibits 1F-18F). Further, there is no evidence of spinal arachnoiditis in the record with respect to 1.04B (Exhibits 1F-18F). Moreover, the record demonstrates that the claimant does not have the inability to ambulate effectively, with respect to 1.04C. For example, the record fails to reveal that the claimant requires "use of a hand-held assistive device(s) that limits the functioning of both upper extremities" (Exhibits 1F-18F). Therefore, listing 1.04 is not met or equaled.

R. 753. The Court finds no error in ALJ Shelton's reasoning in this regard and finds, further, that substantial evidence supports her consideration of Listing 1.04. Specifically, in considering whether Plaintiff meets or medically equals this Listing, ALJ Shelton explained that the neurological defects required by Listing 1.04A are absent, expressly referring to evidence detailed later in her discussion: *i.e.,* that there is no record evidence of spinal arachnoiditis, which is required to satisfy 1.04B; and that the record did not show that Plaintiff was unable to ambulate effectively, including, for example, that the record did not establish that Plaintiff needed to use a hand-held assistive device. *Id*. In addition, at step four, ALJ Shelton engaged in a comprehensive review of the medical evidence relevant to Listing 1.04, noting, *inter alia*, a conservative course of treatment for Plaintiff's severe physical impairments with generally normal, or only minimal, findings: evidence that MRIs in 2012, 2013, and 2015 revealed, *inter alia*, only "minor" degenerative disc disease with no noted nerve root impingement, fracture, or dislocation; exam findings reflected only "mild" lumbar spinal tenderness with a loss of lumbar

25

lordosis and only a "mild" decrease in ranges of lumbar motion; Plaintiff had a normal gait and normal heel-toe walk with no evidence of assistive device use. R. 756−68.

Plaintiff nevertheless complains that ALJ Shelton does not explain why he fails to meet the listing "other than to cite to the entire medical record with no specificity and say that those requirements are not met[,]" which is insufficient. *Plaintiff's Brief*, ECF No. 8, pp. 19−20. The above discussion, however, belies Plaintiff's arguments. R. 753, 756−68; *see also Fullen v. Comm'r of Soc. Sec.*, 705 F. App'x 121, 124 (3d Cir. 2017) ("In this case, like *Jones*, the ALJ's decision, read as a whole, illustrates that the ALJ's conclusion that Fullen did not meet the requirements for any Listing . . . was supported by substantial evidence."); *Jones*, 364 F.3d at 505 ("the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the Claimant] did not meet the requirements for any listing"); *cf. Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 263 (3d Cir. 2006) (finding ALJ's conclusory statement in step three was harmless where, "in reviewing the voluminous medical evidence available to us, we found abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence"). Moreover, Plaintiff, who bears the burden of proof at step three, offers no substantive analysis of the evidence relative to Listing 1.04. *See Plaintiff's Brief*, ECF No. 8, pp. 19−20; *Plaintiff's Reply Brief*, ECF No. 18, pp. 8−10 (failing to refer at all to Listing 1.04 or any evidence relevant to that Listing when addressing ALJ Shelton's step three analysis and relying on his step three arguments in his moving brief). The Court therefore finds no merit in Plaintiff's undeveloped argument in this regard. *Cf. Wright v. Comm'r Soc. Sec.*, 783 F. App'x 243, 245 (3d Cir. 2019) ("We need not address this conclusory, undeveloped accusation.") (citations omitted); *Padgett*, 2018 WL 1399307, at *2. Accordingly,

26

substantial evidence supports ALJ Shelton's finding that Plaintiff did not meet or medically equal Listing 1.04.

### 3.    Obesity

Finally, Plaintiff argues that ALJ Shelton failed to explain why Plaintiff's obesity was "not of a level of severity that met the requirements of the Listings of Impairments" and that her discussion simply cites "the entire medical record with no specificity and say[s] that those requirements are not met[,]" which is insufficient. *Plaintiff's Brief*, ECF No. 8, pp. 19–20.

Plaintiff's arguments are not well taken. Although obesity was removed as a "listed impairment" in 1999, the Court of Appeals for the Third Circuit has recognized that this removal "did not eliminate obesity as a cause of disability." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (citing SSR 00–3p, 65 Fed. Reg. 31039, 31040–42 (May 15, 2000)). "To the contrary, the Commissioner promulgated SSR 00-3p, indicating how obesity is to be considered. This SSR replaced an automatic designation of obesity as a listed impairment, based on a claimant's height and weight, with an individualized inquiry, focused on the combined effect of obesity and other severe impairments afflicting the claimant[.]" *Id.* "Although SSR 00-3p was superseded by SSR 02-1p, 67 Fed. Reg. 57859, 57859 (Sept. 12, 2002), SSR 02-1p did not materially amend SSR 00-3p." *Id.* (citations omitted); *see also* SSR 00-3p, 65 Fed. Reg. 31039-01 (May 15, 2000) ("[O]besity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a Listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.").

SSR 02-1p provides in relevant part as follows:

[W]e consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also

27

remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

. . . .

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

For example, when evaluating impairments under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is "severe," . . . satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F for a physical impairment imposing an additional and significant limitation of function. . . .

We may also find that obesity, by itself, is medically equivalent to a listed impairment. . . . For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence. . . .

We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings. [Footnote omitted.]

However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another

impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1p, 67 Fed. Reg. 57859-02. Accordingly, "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Diaz*, 577 F.3d at 504. "For meaningful judicial review, the ALJ must provide a discussion of the evidence and an explanation of reasoning, . . . but we do not 'require the ALJ to use particular language or adhere to a particular format in conducting his analysis[.]'" *Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 765–66 (3d Cir. 2016)  (quoting *Jones,* 364 F.3d at 505). However, "[c]onclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Diaz*, 577 F.3d at 504.

In the present case, ALJ Shelton identified obesity as one of Plaintiff's severe impairments at step two of the sequential evaluation. R. 750. At step three, the ALJ expressly noted the guidelines set forth in SSR 02-1p and concluded that Plaintiff's obesity, when considered in combination with her other impairments, did not meet or medically equal any listing, reasoning as follows:

> As to obesity, while not stated by any physician to be disabling, it was considered in terms of its possible effects on the claimant's ability to work and ability to perform activities of daily living. Although obesity is no longer a listed impairment, SSR 19-2p provides important guidance on evaluating obesity in disability claims. The Administrative Law Judge is required to consider obesity in determining whether a claimant has medically determinable impairments that are severe, in determining whether those impairments meet or equal any listing, and in determining the claimant's residual functional capacity. Obesity is considered severe when, alone or in combination with another medically determinable physical or mental impairment, it significantly limits an individual's physical or mental ability to do basic work activities (SSR 19-2p). The undersigned earlier found the claimant's obesity to be severe, but the signs, symptoms and laboratory findings of his obesity are not of such severity as found in any listing, singly or in combination with the claimant's other impairments (Exhibits 1F-18F).

R. 753. As previously discussed, ALJ Shelton also considered at step three that Plaintiff did not meet Listing 1.04, which addresses disorders of the spine. *Id.* At step four, ALJ Shelton again specifically considered Plaintiff's obesity as well as his normal cardiovascular exams in addition to, *inter alia*, his ability to ambulate without an assistive device, conservative treatment for physical impairments, and only "minor" degenerative disc disease with no noted nerve root impingement, fracture, or dislocation; exam findings that reflected only "mild" lumbar spinal tenderness with a loss of lumbar lordosis and only a "mild" decrease in range of lumbar motion, as previously discussed. R. 756–67. Accordingly, ALJ Shelton properly considered Plaintiff's obesity at step three and at subsequent steps when she recognized Plaintiff's obesity as a severe impairment, recognized that she must consider the effect of Plaintiff's obesity on his other impairments, found that none of Plaintiff's impairments, whether considered singly or in combination, met or equaled a listed impairment, and specifically and in detail considered Plaintiff's musculoskeletal impairments, and the limitations imposed by all of Plaintiff's impairments, in determining Plaintiff's RFCs before and after the established onset date. *See id*.; *see also see also Diaz*, 577 F.3d at 504; *Woodson*, 661 F. App'x at 765–66; *Jones*, 364 F.3d at 505 (stating that if the ALJ's decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing," "[t]his discussion satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review of the step three determination"); SSR 02-1p.

To the extent that Plaintiff posits—without citation to record evidence or specifically identifying any additional limitations caused by his obesity—that his obesity should have been found disabling at step three, this Court is not persuaded. *See Carter v. Comm'r Soc. Sec.*, 805 F. App'x 140, 143 (3d Cir. 2020) ("In any event, remand to reconsider her combined impairments

is not required because Carter has relied on the language of SSR 02-1p stating that obesity *can* impair one's ability to perform basic work activities rather than specifying *how* her obesity or headaches affected her ability to perform basic work activities" and that the claimant "does not point to any medical evidence that her impairments, determinable or not, limit her ability to perform work activities") (emphasis in original); *Woodson*, 661 F. App'x at 765 ("Woodson simply speculates about how his obesity might exacerbate other impairments—his back disorder, complaints of pain, arthritic knees, congestive heart failure, asthma attacks, or sleep apnea . . . . But Woodson never points to specific medical evidence in the record to demonstrate that his obesity, in combination with other impairments, is sufficiently disabling. Instead, the evidence before the ALJ suggests otherwise."); *Tietjen v. Berryhill*, No. CV 17-8030, 2019 WL 1238830, at *4 (D.N.J. Mar. 18, 2019) (rejecting argument that the ALJ failed to properly consider the claimant's obesity where the claimant "failed to specify how her obesity met the disability criteria contained in the SSR and how her obesity precluded her from performing sedentary work with postural and environmental limitations, as the ALJ concluded she could" and where the claimant "failed to list obesity as an illness, injury, or condition constituting a disability in her application for SSI and SSDI benefits"); *Vargas v. Colvin*, No. CV 15-2502, 2017 WL 123436, at *5 (D.N.J. Jan. 11, 2017) (affirming denial of benefits where, *inter alia*, "[a]lthough [the ALJ's] analysis is rather brief, it is appropriate given the absence of any medical evidence in the record indicating that Mr. Vargas's obesity has affected his functioning in any way. Further, Vargas points to none."). This Court therefore concludes that ALJ Shelton's discussion of Plaintiff's obesity is sufficient and permits meaningful judicial review. *See Diaz*, 577 F.3d at 504; *Woodson*, 661 F. App'x at 765–66; SSR 02-1p. Plaintiff's assertion of error in this regard is therefore without merit.

In short, and fairly reading ALJ Shelton's decision as a whole, this Court concludes that substantial evidence supports ALJ Shelton's finding that Plaintiff's impairments neither meet nor medically equal any listing, including Listings 1.04, 12.04, 2.06, or obesity, and that any error in failing to expressly discuss whether Plaintiff's impairments met or medically equaled a listed impairment as of that date and thereafter is, at most, harmless.

## B.    RFC

Plaintiff next argues that substantial evidence does not support ALJ Shelton's mental RFC prior to February 17, 2016, because she failed to properly consider the mental limitations contained in Dr. Mintzer's report as applicable to the period prior to that date. *Plaintiff's Brief*, ECF No. 8, pp. 21–26; *Plaintiff's Reply Brief*, ECF No. 18, pp. 11–14.[10] Plaintiff further argues that ALJ Shelton should have called a "medical advisor" to establish the disability onset date. *Id.* Plaintiff's arguments are not well taken.

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. §§ 404.1527(e), 404.1546(c); 416.927(e), 416.946(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d

---

[10] Plaintiff apparently does not challenge ALJ Shelton's physical RFC prior to February 17, 2016, that he was physically capable of performing a limited range of sedentary work. *See id.*

607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In addition, an ALJ must evaluate all record evidence in making a disability determination. *Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz,* 577 F.3d at 505–06; *Fargnoli,* 247 F.3d at 42 ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed before March 27, 2017,[11] "'[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight,

----

[11] As previously noted, Plaintiff's claims were filed on January 4, 2013. For claims filed after March 27, 2017, the regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. §§ 404.1527, 416.927 with 20 C.F.R. §§ 404.1520c(a), 416.927c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or

especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d at 43 (3d Cir. 2001) (stating that a treating physician's opinions "are entitled to substantial and at times even controlling weight") (citations omitted). However, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record."). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must consider the following factors when deciding what weight to accord the opinion of a treating physician: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c)(1)–(6); 416.927(c)(1)-(6).

---

give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources").

Accordingly, "the ALJ still may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225 F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the government 'may properly accept some parts of the medical evidence and reject other parts,' the government must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (internal citation omitted).

In the case presently before the Court, ALJ Shelton determined that, prior to February 17, 2016, *i.e.,* the established onset date, Plaintiff had the RFC to perform a limited range of sedentary work, as follows:

> After careful consideration of the entire record, the undersigned finds that prior to February 17, 2016, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: Lift and carry 10 pounds occasionally and less than 10 pounds frequently. Stand and walk for two of eight hours. Sit for six of eight hours. Occasionally climb ramps and stairs. No climbing ladders, ropes or scaffolds. Occasionally balance, stooping kneel, crouch, and crawl. Can understand and carry out simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes. Can work for two hours before needing a break. *Can have occasional contact with supervisors, coworkers, and the public.*

35

R. 756 (emphasis added).[12] In making this determination, ALJ Shelton considered, *inter alia*, Dr.

Mintzer's opinion, distinguishing between the periods prior to and after February 17, 2016,

explaining as follows:

> The psychological consultative examiner, Dr. Lawrence Mintzer, Ph.D., concluded on February 17, 2016 – While intelligent, the claimant has "marked" limitations as to carry out simple and complex instructions, and "moderate" limitations in terms of understanding/remembering complex instructions and making judgments on complex work-related decisions. Further, the claimant has "marked" limitations in terms of interacting appropriately with the public, supervisors, and coworkers, and responding appropriately to usual work situations and to changes in routine work setting. (Exhibit 15F).

> Dr. Mintzer's opinion was based on an exam conducted on February 17, 2016 and what the claimant told him at that exam (Exhibit 15F). In other words, *Dr. Mintzer's opinion does not reach back in time, and certainly not back to the alleged onset date.*

> The undersigned notes, the claimant generally having instructional level, decision-making and work-place changes limitations, as per Dr. Mintzer's opinion is generally consistent with the record for the periods prior to and beginning on February 17, 2016. However, the suggestion that the claimant could not perform even simple work (i.e., a "marked" limitation in carrying out even simple instructions) and the suggestion that the claimant would workplace change limitations that would suggest a finding of disabled is inconsistent with the record for the periods prior to and beginning on February 17, 2016. For example, the record prior to February 17, 2016 documents exam findings of "mild" pain distress (Exhibit 4F/18, 26), anxious behavior ("constantly" walking around the room) (Exhibit 4F/127), and an abnormal mood or affect (Exhibits 2F/1, 4, 8; 3F/24, 32; 4F/58, 127; 5F/2, 3, 6; 10F/2, 4, 7, 9, 10; 11F/5, 7, 8, 9; 13F/6, 10, 18; 14F/1). Further, the record in the period beginning on February 17, 2016, documents exam findings of an abnormal mood or affect (Exhibit 15F; 18F/1, 4, 8, 10, 12, 14, 16, 20), a disshuffled [sic]/ disheveled appearance (Exhibit 18F/1, 4, 8, 10, 12, 14, 16, 20), impaired memory (could recall only 2/3 items after a delay) (Exhibit 15F), and impaired concentration (could repeat on four digits backward) (Exhibit 15F). However, the record failed to reveal, upon exam, any noted abnormal intelligence or thought process findings, and the record otherwise failed to reveal any noted

---

[12] As previously noted, the RFC beginning on February 17, 2016, is the same except for the following modified social interaction limitations: "Can have occasional contact with the public. *Unable to have contact with supervisors or coworkers on even an occasional basis, meaning could have contact on less than an occasional contact with supervisors and coworkers.*" R. 762 (emphasis added).

abnormal memory or concentration findings (Exhibits 1F-18F). As such, the undersigned gives no weight to these portions of the opinion for the periods prior to and beginning on February 17, 2016.

Turning to the remaining portion of Dr. Mintzer's opinion, *namely the social interaction portion, the extent of limitation suggested by this opinion is inconsistent with the record prior to February 17, 2016, but is generally consistent with the record beginning on February 17, 2016*. For example, the record prior to February 17, 2016 documents exam findings of "mild" pain distress (Exhibit 4F/18, 26), anxious behavior ("constantly" walking around the room) (Exhibit 4F/127), rapid speech or talkative-ness (Exhibits 4F/58; 13F/10, 13), and an abnormal mood or affect (Exhibits 2F/1, 4, 8; 3F/24, 32; 4F/58, 127; 5F/2, 3, 6; 10F/2, 4, 7, 9, 10; 11F/5, 7, 8, 9; 13F/6, 10, 18; 14F/1). However, the record prior to February 17, 2016 otherwise revealed that the claimant, upon exam, was alert, fully oriented, pleasant, not in any acute distress, and/or responding appropriately to questions, and/or had a normal affect, normal speech, normal eye contact, and/or no noted abnormal mental status findings in terms of cooperation (Exhibits 1F-8F; 10F-13F). Further, the claimant reported doing activities with/spending time with friends, living with family, and attending medical/mental health appointments, despite being "antisocial", the period prior to February 17, 2016 (Exhibits 3F; Hearing Testimony). However, at the psychological consultative exam on February 17, 2016, the record documents first time abnormal exam findings in terms of impulse control (Exhibit 15F), and the claimant reported on that date not being involved with group activities, not seeing any family members, and rarely leaving his home (Exhibit 15F). He also reported on the day after, at the physical consultative exam, not being able to shop alone. (Exhibits 16F). In other words, the record documented increased self-reported mental health symptoms in terms of social interaction beginning on February 17, 2016.

*Therefore, in light of the above evidence discussion and Dr. Mintzer's opinion not reaching back in time (as discussed above), the undersigned gives no weight to the social interaction portion of this opinion for the period prior to February 17, 2016, and gives weight to the social interaction portion of this opinion for the period beginning on February 17, 2016, which is the date of the opinion.*

R. 765−66.

Plaintiff challenges ALJ Shelton's decision to afford no weight to the social interaction

portion of Dr. Mintzer's opinion for the period prior to February 17, 2016, arguing that "[t]here

is nothing in the record to suggest that the problems that were apparent to Dr. Mintzer on

February 17, 2016, were not equally true prior to that date. [sic] are not at all consistent [sic]

with the evidence of record." *Plaintiff's Brief*, ECF No. 8, p. 25. Plaintiff further argues, "[c]an

37

anyone say, and be taken at all seriously, that if Dr. Mintzer had seen [Plaintiff] one month or

one year or three years earlier, that his assessment would be any different. His findings are

consistent with a long standing mental impairment that was summarized and discussed at length

in prior briefing." *Id*. at 25−26.

For her part, the Acting Commissioner responds that ALJ Shelton properly explained her

reasoning─with express citation to supporting record evidence dated before and after the

established onset date─why she assigned no weight to the social portion of Dr. Mintzer's opinion

for the period prior to February 17, 2016, and the Acting Commissioner contends that substantial

evidence supports ALJ Shelton's explanation in that regard. *Defendant's Brief Pursuant to Local

Civil Rule 9.1*, ECF No. 17, pp. 17−20 (citations omitted).

In reply, Plaintiff insists that "nothing happened on the day of the examination by Dr.

Mintzer to change the functional capacity of [Plaintiff] from what was equally true the day

before or the day before that or at any point since the alleged onset date." *Plaintiff's Reply Brief*,

ECF No. 18, pp. 11−12; *see also id*. at 13−14 ("What happened on that date that was not equally

true the day before or the year or years before that? The answer is that nothing at all happened on

that date. The condition of [Plaintiff] for years before that examination. was detailed in the

record and reflects the same problems being present for that extended period of time. The

Administrative Law Judge decides that was not the case but where is the rationale for why that is

so? It does not exist."). Plaintiff also contends that the Acting Commissioner relied on

impermissible *post hoc* rationalization in defending ALJ Shelton's consideration of Dr. Mintzer's

opined social limitations for the period prior to February 17, 2016. *Id.* at 11−12.

Plaintiff's arguments are not well taken. ALJ Shelton specifically found that Dr.

Mintzer's opinion was based on his examination of February 17, 2016, and expressly did not

reach back in time prior to the date of that physician's report. R. 765−66. Substantial evidence supports ALJ Shelton's reading of Dr. Mintzer's report in this regard. The report expressly states that the "[t]he [social] limitations above [are] assumed to be your [Dr. Mintzer's] opinion regarding *current limitations only.*" R. 649 (emphasis added). Notably, Dr. Mintzer was invited to state the date on which those limitations were "first present" *if* he had "sufficient information to form an opinion within a reasonable degree of medical or psychological probability as to *past limitations*," but he did not offer any earlier date to which his findings or opinions related. *Id.* (emphasis added). Moreover, as detailed above, ALJ Shelton's consideration of the record evidence also supports her conclusion that Dr. Mintzer's opined social limitations did not reach back to any date prior to the date of his report. Specifically, ALJ Shelton, with citation to the record, contrasted the evidence for the period before February 17, 2016, and the evidence for the period beginning on that date, noting differences in Plaintiff's behavior, such as impulse control; examination findings; Plaintiff's activities and agoraphobia; and Plaintiff's level of social interaction. R. 765−66 (citations omitted). This record therefore provides substantial evidence to support ALJ Shelton's conclusion to afford no weight to Dr. Mintzer's opined social limitations for the period prior to February 17, 2016. To find otherwise would require this Court to impermissibly interpret raw medical data.

Plaintiff's insistence that these opined social limitations "are consistent with a long standing mental impairment that was summarized and discussed at length in prior briefing[,]" *Plaintiff's Brief*, ECF No. 8, p. 26, does not militate a different result. Plaintiff provides no substantive discussion regarding this purported evidence. Nor does he provide any citation to the record to support his position. *Id.* Plaintiff's generalized reference to "prior briefing" is deficient where he attaches three briefs totaling 63 pages that were filed in the case before Judge Hayden

and identifies neither the particular brief nor the particular page on which this purported argument appears. *See id.*; *see also* ECF Nos. 8-1, 8-2, 8-3. The Court will not hunt through 63 pages of briefing filed in a different lawsuit to construct Plaintiff's arguments for him. *See Atkins v. Comm'r Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("'[J]udges are not like pigs, hunting for truffles buried in the record.'") (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)) (internal citation omitted)); *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) ("[T]his Court has frequently instructed parties that they bear the responsibility to comb the record and point the Court to the facts that support their arguments."); *Padgett*, 2018 WL 1399307, at *2. Notably, even if the Court were to piece together some reference to evidence or argument from this briefing that might support a finding that Dr. Mintzer's opined social limitations could apply to the period prior to February 17, 2016, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Chandler*, 667 F.3d at 359; *Hatton*, 131 F. App'x at 880. The Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose his−or this Court's−own factual determination. *See Chandler*, 667 F.3d at 359; *Zirnsak*, 777 F.3d at 611.

Plaintiff's contention that ALJ Shelton should have called a "medical advisor"−medical expert−to ascertain the onset date is similarly unavailing. *Plaintiff's Brief*, ECF No. 8, pp. 23−26; *Plaintiff's Reply Brief*, ECF No. 18, pp. 13−14. "The decision to call on the services of [a medical expert] is always at the ALJ's discretion. Neither the claimant nor his or her representative can require an ALJ to call on the services of [a medical expert] to assist in

40

inferring the date that the claimant first met the statutory definition of disability." SSR 18-01p, 2018 WL 4945639, at *6 (S.S.A. Oct. 2, 2018); *see also id*. at *1 ("[T]his SSR clarifies that an administrative law judge may, but is not required to, call upon the services of a medical expert, to assist with inferring the date that the claimant first met the statutory definition of disability."), *7 ("This SSR is applicable on October 2, 2018. We will use this SSR beginning on its applicable date. *We will apply this SSR to new applications filed on or after the applicable date of the SSR and to claims that are pending on and after the applicable date*.") (emphasis added). For the reasons already discussed, substantial evidence supports ALJ Shelton's conclusion that Dr. Mintzer's opined social limitations applied only to the date of his report, February 17, 2016. *See id*. at *5 ("When a claimant has a non-traumatic or exacerbating and remitting impairment(s), and we determine the evidence of record supports a finding that the claimant met the statutory definition of disability, we will determine the first date that the claimant met that definition."). Based on this record, the Court cannot say that ALJ Shelton committed reversible error in failing to call a medical expert. *See generally id*.

In short, for all these reasons, the Court concludes that ALJ Shelton's findings regarding Plaintiff's RFC for the period prior to February 17, 2016, including the finding that Dr. Mintzer's opined social limitations were entitled no weight for that period, are consistent with the record evidence and enjoy substantial support in the record.

## C.    Step Five

Finally, Plaintiff challenges ALJ Shelton's step five determination, arguing that the Commissioner failed to carry her burden at that stage because the hypothetical questions posed to the vocational expert, which included ALJ Shelton's RFC determination for the period prior to February 17, 2016, failed to include all of Plaintiff's claimed limitations. *Plaintiff's Brief*, ECF

No. 8, pp. 27−28; *Plaintiff's Reply Brief*, ECF No. 18, pp. 14−15. Plaintiff also contends that the

vocational expert's testimony establishes that the RFC for the period prior to February 17, 2016,

precludes the jobs identified by that expert. *Plaintiff's Brief*, ECF No. 8, pp. 28−29; *Plaintiff's*

*Reply Brief*, ECF No. 18, pp. 14−15. Plaintiff's arguments are not well taken.

      At step five, an ALJ must decide whether the claimant, considering the claimant's RFC,

age, education, and work experience, can perform other jobs that exist in significant numbers in

the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). Unlike in the first four steps of the

sequential evaluation, the Commissioner bears the burden of proof at step five. *Hess v. Comm'r*

*Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205

(3d Cir. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005)). "'Advisory

testimony from a vocational expert is often sought by the ALJ for that purpose [of determining

whether other jobs exist in significant numbers in the national economy that the claimant could

perform] . . . and factors to be considered include medical impairments, age, education, work

experience and RFC.'" *Id.* at 205–06 (quoting *Rutherford*, 399 F.3d at 551). "Testimony of

vocational experts in disability determination proceedings typically includes, and often centers

upon, one or more hypothetical questions posed by the ALJ to the vocational expert."

*Podedworny,* 745 F.2d at 218. "Usually, the ALJ will ask whether a hypothetical claimant with

the same physical and mental impairments as the claimant can perform certain jobs that exist in

the national economy." *Zirnsak,* 777 F.3d  614 (citing *Podedworny*, 745 F.2d at 218). "While

'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established

limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment

alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (quoting

*Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's impairments, the ALJ must

include all 'credibly established limitations' in the hypothetical. *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations are limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554. "Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id*. (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

In the case presently before the Court, the hypothetical question posed by ALJ Shelton to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by ALJ Shelton for the period prior to February 17, 2016. R. 756, 690–91. The vocational expert responded that the jobs of sorter, assembler, and inspector would be appropriate for such an individual. R. 690–91. For the reasons discussed earlier in this decision, this hypothetical sufficiently captured Plaintiff's credibly established limitations and therefore supported ALJ Shelton's determination at step five. *See Rutherford*, 399 F.3d at 554; *Podedworny*, 745 F.2d at 218. To the extent that Plaintiff's criticism of the hypothetical questions is that all his alleged impairments were not addressed, this criticism boils down to an attack on this RFC

determination itself, *see Rutherford*, 399 F.3d at 554 n.8, which this Court has already rejected for the reasons previously discussed.

Plaintiff next argues that the vocational expert's testimony establishes that the RFC for the period prior to February 17, 2016, precludes the jobs identified by that expert. *Plaintiff's Brief*, ECF No. 8, pp. 28−29; *Plaintiff's Reply Brief*, ECF No. 18, pp. 14−15. In advancing this argument, Plaintiff relies on the following exchange during the administrative hearing between ALJ Shelton and the vocational expert:

> Q Let me ask you another hypothetical. If the same individual [with the RFC for the period prior to February 17, 2016] were unable to work with co-workers, unable to have contact with supervisors or co-workers on even an occasional basis, that's a less than occasional contact with supervisors and co-workers, would there be any work for that individual?
>
> A No, Your Honor.
>
> Q All right. If the individual were going to have an inappropriate interaction with a supervisor or co-worker on two occasions a month, and let's define that as conduct unacceptable to the employer, would there be any work for that individual?
>
> A No, Your Honor. That would be work preclusive.

R. 691−92. Plaintiff specifically argues that, because ALJ Shelton found that Plaintiff was limited to occasional contact with, *inter alios*, supervisors for the period prior to February 17, 2016, this reflects that Plaintiff had "inappropriate interaction," as defined by ALJ Shelton, with supervisors, which the vocational expert testified would be work preclusive. *Plaintiff's Brief*, ECF No. 8, pp. 28−29.

Plaintiff's argument is not well taken. The Court agrees with the Acting Commissioner that, based on a fair reading of the hearing testimony, Plaintiff incorrectly assumes that Plaintiff would have "inappropriate interaction," as defined by ALJ Shelton, simply because Plaintiff was limited to occasional contact with, supervisors (as well as co-workers and the public) for the

period prior to February 17, 2016. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 17, pp. 23–24. Notably, ALJ Shelton never equated "occasional contact" with "conduct unacceptable to the employer." R. 691–92. Moreover, ALJ Shelton specifically limited Plaintiff to "occasional" contact with supervisors, coworkers, and the public for the period prior to February 17, 2016, and did not find that Plaintiff was disabled for that period. R. 756–61, 765–66. Therefore, based a fair reading of the hearing testimony and ALJ Shelton's decision, the fact that ALJ Shelton posed to the vocational expert an alternative hypothetical question that contained different social limitations than did the RFC actually found by ALJ Shelton for the period prior to February 17, 2016 is irrelevant when the RFC ultimately found by ALJ Shelton for that period is supported by substantial evidence.

In short, the Court finds that the Acting Commissioner has carried her burden at step five of the sequential evaluation and concludes that substantial evidence supports his determination in this regard.

## VI.    CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  February 7, 2023             _____*s/Norah McCann King*_____
                                    NORAH McCANN KING
                                    UNITED STATES MAGISTRATE JUDGE